Good afternoon, Your Honors. John Bickford on behalf of the Plaintiff and Appellant. I'd keep an eye on the clock, but I'd like to reserve two minutes of the time to rebuttal. I'd like to focus the argument on the B-3 issue, and if there's time or if the Court directs me there, we'll discuss the B-2 issue as well. During the course of discovering this case, the Plaintiffs asked the defendants how they got prior express consent for all the calls they made at issue in this case. They responded in two ways, through membership in the H Honors Program and through a guest of one of the many Hilton-affiliated hotels providing their cell phone number at the time of making a checking in or reserving a room at one of their hotels. As a result, we tailored two subclasses to respond to those two issues of prior express consent. The H Honors subclass, which is going to ask the common question of whether the common language in the H Honors terms and conditions constitutes prior express consent for the calls at issue here. The second one was the reservation check-in subclass, which asks whether voluntarily providing your phone number to a Hilton-affiliated hotel constitutes prior express consent for the Hilton Grand Vacations Club to call you promoting their timeshows. It's our contention that these two classes were entirely cohesive. There's no situation in which one member of each of those classes would have consented in a way that's different than the others. If we prevail on our theory for the H Honors subclass, then we win across the entire H Honors subclass. If in the H Honors subclass the uniform terms and conditions set is prior express consent, then we lose across the entire class. The same is true of the reservation and check-in class. If providing- Let me make sure I understand. If you win on the terms and conditions, wouldn't you still have individual determinations as to whether there was specific consent not relying on those other terms and conditions, but somebody says, you're signing up for H Honors. By the way, you give us your cell phone, and we will make sales calls to you. And people just happily say, yes, I'd love to get sales calls on my phone. If there was evidence in the record that that actually occurred, that's a possibility, Your Honor. We may have individual issues. I think there is evidence, isn't there? I would contend there's not, and I'd love for the defendants to actually point to that. Because what they have said is, yes, there are these individual interactions, especially in the reservation check-in. You know, you check into a hotel, they'll ask for your cell phone number, and they provide it to you. But nowhere in the evidence, and I'll ask the court to ask the defendant to point to it, because it's not there. Is there any evidence, any declaration from a hotel employee, any declaration from someone in management that says this is what we do? But there's absolutely no record in the evidence. And this is why it falls so directly under this Court's decision in Meyer. In that case, the defendant came forward and said, well, there might be individual issues of prior express consent, because some of these people may have consented, but we got their numbers through skip tracing. And this Court said, well, there's not a single example in the record where that is actually the case. And as a result, we're not going to come up with these hypothetical and individualized individual issues to defeat class certification. And that certainly makes sense when you're weighing the common questions and the individual questions. An individual issue can't predominate over the common question when there's no evidence that it actually occurred. And so that goes to the reservation and check-in subclass. There are individual interactions, but there's no evidence in the record that someone, that a hotel guest, or sorry, a hotel employee said, we're going to take your cell phone number and what we're going to do is we're going to provide this to Hilton Grand Vacations, and you're going to receive daily calls for a week asking you to come to see our timeshares. Nobody claims, Hilton certainly doesn't claim that they were given something quite that explicit. You know, we're going to call you every day for a week. I think the representation is that they said you might get calls offering you services or opportunities, you know, something generic like that. Well, again, there's just no evidence. And that's the real thorn in this case is that they claim these individual issues exist, but there's not a single example. Remember, this class is 6.5 million people, which is therefore 6.5 potential individual issues of consent, yet we don't have a single example of consent other than what they said how they get consent. They get consent in one of two ways for all 6.5. And how do you get the 6.5 million? That's the size of the class. If you're asking how we determine that through discovery. What does it consist of? I'm sorry? What does it consist of? How do you define the class? Well, the class is going to be divided into two subclasses. I understand that. And I believe, and I could be wrong on the numbers on this, the H honors consists of about 3.5, I think, and the other one is about 3 million. And that's through their own records of how they gathered this. It's not hard for Hilton to determine. I'm not asking you for how you came up with your calculations. I'm asking you how you define the class. Are these people who gave the cell phone numbers? Are they people who have actually gotten calls? What are they? These are people who actually received the calls. And how do you come up with a number of 6.5 million? Through discovery from Hilton. Hilton has kept track. Hilton has a record of all the people who have gotten calls. That's correct. Every single call and who it is and who they contend they get consent from via the uniform terms and conditions. And the remainder, which are the people who voluntarily provided their cell phones at the time of check-in. I've got the following question for you. The district judge in the exercise of discretion declined to certify. We review for abuse of discretion, so I get all of that. And you proposed two subclasses. And the reason given by the district judge for declining to certify either of the two classes or subclasses is that in each of the proposed subclasses, there are a variety of ways in which they might have provided their phone numbers. That's correct. Why didn't you ask for further subclasses? So, for example, a subclass of people who provide their phone number by filling out a paper application. With respect to those people, it will be uniform. That's correct, Your Honor. Hang on a second. But you didn't ask for that. You asked for a subclass including this as part of the subclass. So without your saying, well, listen, Judge, I'm going to cut it down even further, and as to everyone who filled out a paper application, we know that's uniform, but you didn't do that. Why not? Well, during the oral argument on this matter, the district court judge did ask, would subclasses fix this? And we said it would. But, again, we don't think that's an issue, because if you look especially for the H. Honors, the terms and conditions, yes, we contend people did sign up for the H. Honors terms and conditions online, on phone, and by person. But what's common to all that is that in order to sign up, you have to agree to the common terms and conditions. The same for the reservation and check-in class. We contend people did sign up or did reserve rooms online, in person. What's common to this is they all voluntarily provided their cell phone. What's also common to this is there's no evidence that these individual interactions, these discussions that we would have to purportedly analyze on an individual basis even exist. There's no record that not a single hotel employee told someone at check-in, we are going to call you. I don't think you're answering Judge Fletcher's question. Maybe you didn't understand it. But as I understand it, he's asking you, why didn't you ask for a subclass of the people as to whom there's no argument there was an individual interaction, because they did it on paper? So they can't say there are individual interactions to be had, because it's all, the record is entirely based on paper. You either win or lose on the question of whether the disclosure terms are enough. That's correct. I think that is Judge Fletcher's question. Yeah, I thought you would have a pretty good class if that's what you proposed, but that does not appear to be what you did propose. Well, if we look at what happened, we would have had to have proposed that in our reply brief, because until we got to the opposition, we didn't know these, they would come up with all these different ways and claim that these were different ways they got consent, despite the fact that earlier in their case, they said they got consent for everyone in one or two ways. No, you don't have to wait for a reply brief, you can lose on the motion, and then you say, okay, we've learned something, so now we make a second motion for class certification, we ask for a subclass consisting of just the people as to whom there can't possibly be an individual interaction, because it's all done on the paper. That is something we possibly could have done. We have, based on my experience in moving for class certification, once you move, even when you try to redefine, there are sometimes issues with judges' ability to even hear that or wanting to even hear that. I will note, before my time runs out, that at the hearing, we did say that if this was the judge's concern, we could redefine that. I'll reserve the remainder of my time for any rebuttal unless there's any other questions from the Court. Okay. We'll hear from the other side. Good afternoon, members of the Court. My name is Angela Grusin. I represent Hilton today. Thank you for allowing us to be here. I'll start with, if you like, the last portion of the questions that you raised with counsel, in particular the question of subclasses. I think it's important to understand why subclasses would not be manageable here. An example of that is, when you look at the various ways in which Hilton guests, loyal customers of Hilton, provide consent to be called on their cellular phone, there are a number of different ways. Yes, the two main methods would occur during the Hilton Honors enrollment as well as during the registration, whether it be prior to or at the time of appearing at a hotel, and there are numerous interactions that occur along the way. So let's look at the evidence that was presented below about that. We know that Mr. Connolly, one of the putative class members, stayed a number of times at Hilton Resorts and Properties, made reservations under a number of different ways. During the registration process, whether it occurred online, through a travel agent that he used, or through his business partner who he authorized to make reservations for him, he received information and confirmation about that stay, which included reference to Hilton's privacy policy. Mr. Merritt testified in deposition in this case, and his deposition testimony is in the excerpts of record, that when he showed up in Sarasota, Florida to check in for a reservation, he had a conversation with the reception desk, during which he was handed a piece of paper that provided information about his stay that he chose not to read. He was distracted by family members, he said. He also was asked for his cellular telephone number. He asked the clerk, he says it's under oath, I asked the registration clerk, why do you need my number, what for? And the clerk, the registration agent, told him. So he was going to call him when his room was available. His own idiosyncratic experience, the interaction that he had alone, suggests that that is not a common issue. Every guest who shows up and has a question with an agent, on premise, or on the phone, or through a travel agent, or through a business partner, when asked for their telephone number, can ask those questions and does. They get a variety of responses. Let me ask you this, as to the second person whom you just described. He says, why do you need my number? And the answer is, so we can call you when your room is ready. And then he gets promotional stuff afterwards. Is that a violation? I'm not asking class certification now, I'm just asking a violation of the statute. We believe it is not. Because? Because the issue of consent to be called is a spectrum of conduct. I know, but the facts you just gave me, he says, why do you need it? So we can call you? He says, okay, you can have it. That strikes me as, I give you the phone number for this purpose. There is no question that there will be putative class members within the definition that currently exists that may not have a viable claim, and there may be those. Now you're sliding off my question. No, no, I am. Would you please answer my question? Yes, I will. Yes, I think that there will be instances in which consumers have not. That's not the answer to my question. The answer to my question would be yes or no with respect to the specific person you just described, which is to say, why do you need my phone number? We can call you when your room is ready. He then says, okay, you can have my number. He is then called for various solicitations. Is that a violation? Your Honor, I do not believe it is. Because? Because under the line of cases that follow the FCC's 1992 order, that providing a cellular telephone knowingly is consent to be called on that number unless consent is withdrawn is, in fact, within the TCPA. As well, this Court has ruled in Roberts v. PayPal that providing, the mere act of providing a telephone number to an entity is consent to be called. We would also direct the Court. So to be called with advertising on another related matter? We would also direct the Court to. I would just ask you a question. The policy, the privacy policy. I asked you a question. You said this is what our case says. Correct. Okay. So I just asked you a question about the case. So now your answer needs to focus on that case. eBay, right? PayPal. PayPal, I'm sorry. Same place. Yes. I think the PayPal case as well as Baird v. Sabre would be directive on that issue. I'm sorry? And the Baird v. Sabre case from this Court as well would be. And it says you can. Yes. In that case, providing a telephone number. Can you point me out where? Yes. The Roberts v. PayPal case. In that case, the providing of the cellular telephone number was used, was considered to be, consent to be used beyond just this mere transaction  and in the Baird v. Sabre case. I'm sorry. It said the consent extended beyond the reason? Yes. As long as it was within the normal business communications of the relationship between the parties, then that was permissible ongoing communication. I'm sorry. So you think that when you check into a hotel and you say, I'm giving you my phone number so you can tell me when the room is ready, you're also saying, and by the way, call me to sell me widgets. I appreciate. You can give this phone number to anybody to call me. I believe a legal argument does exist, but I think the point of what I'm trying to say today is that that is a very individualized inquiry. That experience is not going to be uniform across. You're answering Judge Fletcher's question as to whether the individual who says, I'm giving you my phone number so you can call me to get my room, whether that, when my room is ready, whether that constitutes consent for that individual, not for a class, not for anybody else, to be called on sales calls. If that was the only time and the only manner in which an individual gave his cellular telephone number, then I agree. It may very well be a violation. However. I'm sorry. No, no. There's no however about it. You say only time and only manner. You've been given a hypothetical. You've been given something. There are no other facts. Okay. So what is your answer to the question? That is a violation. Isn't that your answer? Yes. Based on your hypothetical, yes. But we have to remember. That's just hypothetical, but I've adopted it. Yeah. And it wasn't my hypothetical. It was your fact. But what's relevant here is that this marketing program targeted and was directed at people who had ongoing and longstanding business relationships with Hilton. These were people who didn't just have one encounter. Let me ask you a question. What evidence do you have that anyone was ever told when they handed over the cell phone that, by the way, you're going to get sales calls? So every punitive class member who enrolled. I'm asking you for what evidence you have. The answer to a question, what evidence do you have, is to point me to something in the record and identify the affidavit, a declaration, you know, something. Thank you. So go ahead and tell me. I've got the record. I will be specific, Your Honor. David Gus, the vice president of Hilton Grand Vacations Marketing, provided an extensive declaration chronicling the manner in which Hilton guests provide their cellular telephony. Where is that in the record? In the excerpt. So we can look at it together. Oh, Gus, here we go. I have it right here. I have it right here. It starts at ER 748. And, Mr. ---- And you point me out to a ---- The testimony is, the declaration is very robust, and it describes the ways in which Hilton ---- Give me a page and a line number. In the first page of his declaration, Mr. Gus identifies ---- There is an ER page at the bottom that goes something like ER-750. That's the first page. There's also another number that says 003 on the first page. So you can use either number system. I just want to make sure we're on the same page. Beginning in his declaration, Mr. Gus ---- Page number. ER-750. Okay. Line. I'm going to speak generally about the beginning paragraphs. He sets up for the court the ways in which the Hilton Grand Vacation Marketing program works. Do you remember the question? I'm just ---- Do you remember the question? I'll just make sure we're on the same page. The question is, what evidence is there of anybody at Hilton providing information to people who give their cell phone numbers, saying you are going to get sales calls? What evidence is there of even one instance of that happening? If the court looks at ER-752, beginning at paragraph 12, it says, individuals who wish to join the Hilton Honors Program may do so in one of several ways. Correct? Then at paragraph 14 of that same page, applicants voluntarily provide Hilton with their telephone numbers in different manners, depending on the way in which they join the program. And in that paragraph, and in the paragraph 15 that follows it, Mr. Gus describes the Hilton Global Privacy Policy and the Hilton Honors Terms and Conditions. During one of the three ways in which applicants join Hilton Honors, they are asked to provide a phone number, not required to. They are also told, in three different ways, to check the box either through an online click wrap, or through an in-person box checking, or through telephonically instructing. Do you remember the question? Yes, and I'm getting there. And the Hilton Honors Terms and Conditions and the Privacy Policy is accepted. And then I'd like to direct the court to the Privacy Policy. Do you remember the question? Yes, Your Honor. What is the question? Just want to be sure we're answering. What evidence is there that applicants and members of the Hilton Honors Program accept, agree to be called? That's not the question. You see, you're not remembering the question. The question is, where is there evidence of record of even a single instance where somebody is told, not in writing, not clicking, not checking, is actually told by a Hilton employee or somebody, you are giving me your cell phone number and you may get sales calls. Where is there evidence that this has happened even once in the history of the world, going back to Genesis? So your question, I'm sorry, I really want to be very clear on what you're asking, not in writing. Orally you're asking, solely orally or in writing? I said told, orally. In one of these transactions that you say are all individualized transactions. Because anything that's in writing we don't have to worry about. Those are all standardized. We can figure them out. So you say individualized transactions are all these various ways in which people have these interactions. I want an instance, one single instance in the six million you've got here, where there's evidence that Hilton employee said I got the phone number and I told them you'll get sales calls. We don't have a specific reference to a document that reflects that. But what we do have. Do you have a general reference? We know that Mr. Merritt had a contemporaneous discussion about that. We know that from Mr. Guss' declaration that that is the policy. You know, telling me things that we know doesn't help me at all. If you think it's in the record, I need you to point me in the record where it is. If you're not telling me we know doesn't help, that doesn't advance your case at all. So where is it that we know this from? And where is the reference specifically to being told you will get sales calls? Your Honor, we do not have a declaration from an employee. So why don't you lose? Why isn't that the end of the case? Since you don't have any evidence of any such individual transactions as the district court seemed to find acceptable, why isn't the basis used by the district court for denying class certification simply not supported by the record? What the district court found, though, was that there were numerous within the spectrum of what is consent. We don't have a scenario in which there is one uniform standard. We have a scale, a variety of ways. I understand. That's why I asked you for the most favorable thing to your case. I believe, Your Honor, the most favorable point is that when, whether it's a Hilton Honors applicant or a guest at Hilton Hotels provides their telephone number, they are, and when they make those reservations and join the program, they are informed of and bound by the Hilton privacy policy. The Hilton privacy policy— And that's an argument you can make, and you may win on that argument. But that's a different argument from saying there were individual transactions where people are actually told you are going to get sales calls. And we can't decide that as a matter of class because those are individual transactions. Some people said there were sales calls. Some people said it this way. Some people said it the other way. And if you're going to win on that argument, that all these individual transactions are different, you have to demonstrate something that actually says people were really, in fact, told. Some people were told there will be sales calls. And I just don't see anything in the record that supports that. What we have is Mr. Guss' declaration based on the business practices of Hilton, in which he says that, yes, during the interactive discussions, whether it be by phone or in person, opportunities arise, like we know from Mr. Merritt, where there is a question, how are you going to use our information? He testifies in his declaration that those instances occur, and we know from Mr. Merritt that they did. We also know from a very long line— Can you point me to his declaration where he says that and how he says it exactly? Yes. Yes. Just to be clear, he never says we have a policy of always telling people. What he says is if they ask a lot of pesky questions, we will come up with this information. Is that basically what he says? Well, he says that there is a privacy policy that specifically states that when you give us your personal information, including your phone number, we are going to call you. The privacy policy— So, okay, where does he say that? In the privacy policy itself, it states that, that that is the policy of the company. No, but is that what Mr. Guss says, or is that what the policy says? I'm asking you about in his declaration. He says that that is the policy that permeates throughout the Hilton Gambit case. I want to make my question clear. Are you quoting Mr. Guss, or are you quoting the privacy policy when you say that? I was quoting the privacy policy. Oh, okay. So not something that Mr. Guss says. You're quoting the policy. Okay. Well, I'm quoting Mr. Guss' testimony that the privacy policy exists and it governs the relationship— No, I got that. No, I got that. And I think what's important here is why this information— How does that help you? It helps when you look at the line of cases, whether it's Gannon, Gene v. Gene, Conrad, there is a whole line of cases in which individuals have very specific relationships with the businesses that they transact with. That is a direct relationship in which information is exchanged and various circumstances arise that give rise to the issue of consent to be called. And in each one of those cases, the courts look to the opportunity for interactive expressions, for expressions of consent based on the idiosyncratic exchange of information. In Conrad, the Court made very clear that those interactions could, the Court's words were, could give rise to— Anything like here that says a directive that if you get consent in writing or orally, you're supposed to tell people, you're supposed to volunteer that they're going to get sales calls? No, we have presented no evidence of that. Instead, we've presented evidence of a company-wide privacy policy that each of its customers is directly requested to either join through a click wrap or through repeated communication— Counsel, Counsel, Judge Gould, if I could interject. Yes. A question on that policy. My recollection is that it does expressly say that people in their numbers will get promotional materials. But my question is, do all the people, all the guests who enroll in that program, do they read that policy before they've given their number? Normally, I would think they haven't. Then maybe they get the policy later and they click on it or something. Your Honor, you raise the exact question here, and that is, it, that is very much an individualized inquiry that would have to be made. There would be guests who would read the policy, understand it, and accept it. You'd have guests, like Mr. Connolly, for example, who said he didn't read it. But they all have been given the policy. They've all been asked to accept policy in one means or another. And whether they read it or didn't read it are individual inquiries that form the question of whether that, in fact, was consent or not. But that is a question that can't be handled on a class-wide basis. It, in essence, begs the question of what did they do, what did they understand. But we know that the policy was there. We know that they were informed of it on multiple occasions. Mr. Connolly and Mr. Merritt were given repeated information linking them to this policy. And the policy states very clearly that we will call you on your cell phone or we will send you texts telling you about timeshare and vacation opportunities. Those exact words are used in the policy, the privacy policy, as well as the Hilton terms and conditions. Well, it seems to me if that's dispositive, then you will win this class-wide. I'm just failing to see how these supposed individual transactions make any difference and how this could possibly have been right in denying class certifications. I mean, you may get class certification and then win on the policy and say, well, you signed up to this policy. It doesn't matter whether you read it or not. Too darn bad. So if you gave them your phone number and they said it's to get your room, they hand you a piece of paper that says, and by the way, when you give us your number, we'll also call you for sales calls. That's too darn bad. But what does it have to do with individual determination, individual transactions? Well, much like the Gannon case, the Gene and Gene case, and even the Conrad case, because of the ongoing communications between the caller and the consentor, there are opportunities and discussions that can absolutely frame what constitutes consent. In fact, these varied interactions provide dissimilar opportunities. Gannon, Central District of California. I'm sorry? Gannon, Central District of California, right? Yes. We have Gannon, Your Honor. And then there's Gene, which is Fifth Circuit. Anything in any good jurisdiction? Yes, Your Honor. Like anything binding on us? For example, the Northern District of California. Ah, well. We have Gannon, which is the Central District of California. We have Vigas, which is not in California, but, again, a case very similar on its merits involving individual transactions. There's no authority or Supreme Court authority, right? Just to be straight. There's no binding authority. No. This would be a case of first impression for this Court. Although I would argue that this Court has already made a determination that simply providing the cell phone may be enough. But, no, we do not have a directive on the issue of what there's no standard out of this Court. Then you were on the merits. I mean, that doesn't help you at all on the classification issue. Correct. What we're talking about now. Don't you feel better winning on the merits rather than on this, you know, cheap way on the classification issue? Well, I do believe both would be beneficial. However, because we have the obligation to review classified. Maybe we'll give you a chance to enjoy the other one, too. But I think you're out of time. Thank you, Your Honor. I think you're out of time, too, but we'll give you a minute for a bottle if you wish to take it. Thank you, Your Honor. Real quickly, I do want to address those non-binding cases. In Vingas, that was a riverboat casino. The individual only received the calls because his phone number had been resigned to someone who had consented. It is nothing like this case. And the same with the other case, the Gannon case, which is an individual who accidentally called a sex line service, a phone service, and then claimed he didn't consent. And it was just impossible to determine people who did and didn't consent. It's not like this. Let me tell you the problem I have with your case. I think with respect to uniformity and certifiability of the class, if you wanted a class of people who signed up either on paper or online and clicked saying they agreed with the privacy policy, you lose. Because the privacy policy very explicitly says we're going to contact you with promotional stuff by phone. So I can see why you don't really want to certify that narrow class because it's a loser. The cases that you're going to win are going to be the individual cases where you have individual interactions. And those are disparate. That's my problem with your case. The plausible part of your case on the merits is the disparate part of your case. The losing part of your case is uniform. So how do you respond to that? Well, you know, I would remind the Court and the Court's well aware we don't look at merits and determine whether to certify the class. Yeah, I understand. Absolutely. I understand all of that. On the other hand, I look at the privacy policy and it's just plain as day that the privacy policy consents to these calls. I see exactly what you're seeing. And I see a heavy hill to go with the H honor subclass. Now, with the individuals who did the reservation and check-in, let's think about how are they, predominance is all about how are we going to try the case, right? What is going to be common and what's going to be individual? It's their burden, it's their affirmative defense to prove prior express consent was obtained. They, at trial, they are going to say, well, everyone in the H honor subclass consented because look at this language that your honor seems to say, yes, prior express consent. And then they're going to say, well, look at the FCC 1992 order. And it says if you provide a cell phone number voluntarily to an entity, that entity can call. And so the issue then will be, was Hilton Grand Vacations the same as Embassy Suites? Are they different entities? But because that is how we're moving forward. That's plaintiff's theory of liability. Yes, we might lose on the first half, like your honor is saying, but we might win on the second. I understand the rule. The rule says same entity as well as the relationship. So is the argument here that you're getting calls from people other than Hilton? That's what we will argue on the merits. That's correct, your honor. And because of that, I mean, well, you know, we referred to Hilton Grand Vacations as Hilton. It's actually, as you're probably aware, a conglomerate. Embassy Suites, Hampton Inn, I have a long list of all these hotels. And that's going to be the question. And that's what we're going to go up against on the merits. But because their defense is going to be, look at this uniform terms and conditions that H. Honors subclass agreed to and look at the fact that everyone voluntarily provided their cell phone number, regardless of what may or may not have been said, regardless of evidence or to the contrary, we can decide both of these issues very probably on a motion, cross motions for summary judgment, your honor. So you may win on the entity issue, then. Okay. We may. We may. But now is not the time to decide that, just as now is not the time to decide whether we will lose on the H. Honors. Let me ask you this, then. Did you ever ask the district judge to certify anything other than the two subclasses that you proposed? Because as I look at the two subclasses that you proposed, as you proposed them, they are too disparate. Did you ever say, but judge, what I really want to do, then, given your response, is I want a subclass that is all written applications. I want a subclass that's all online applications. To answer your question directly, after the order came out, no. But during the hearing, we said if the court asked, and I encourage the court to look back at the hearing transcript, the court said, will subclasses fix the problems I'm saying? And we said, yes. Yes, it will. And that's the closest I can to respond to the answer on that. I have nothing else to say unless there's any more questions from the panel. Thank you. Then we're adjourned. The case is decided. We'll stand submitted. We're adjourned.
judges: Kozinski, W. Fletcher, Gould